UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORENZO COBBS,<br><br>        Petitioner,<br><br>  v.<br><br>JOSEPH MCGRAFF,<br><br>        Respondent.<br>_____/ | No. C 01-2272 SI<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |

On June 11, 2001, petitioner filed a petition for writ of habeas corpus in this Court. Petitioner argued that his counsel was ineffective for failing to investigate the state of his mental health, and that petitioner was incompetent to enter his plea of nolo contendere. The Court denied his petition. Petitioner appealed and the Ninth Circuit reversed and remanded for an evidentiary hearing on the issues of both ineffective assistance of counsel and competence to enter a plea. The Court held an evidentiary hearing on October 24 and 25, 2006, and the parties subsequently submitted post-hearing briefs. Having considered the evidence presented at the hearing, and the papers submitted, the Court rules as follows.

**BACKGROUND**

On August 19, 1998, petitioner was charged with one count of robbery[1] for taking a gold necklace from the neck of a thirteen year old boy on July 25, 1998. Resp.'s Ex. 1[2] (Clerk's Transcript of criminal proceedings, hereinafter "CT") at 21-26. At that time, petitioner was alleged to have two

---

[1] Cal. Penal Code § 212.5.

[2] "Respondent's Exhibits" refers to exhibits submitted in connection with the pre-remand habeas petition, not in connection with the more recent post-evidentiary hearing briefing.

prior strikes and serious felonies, several prior prison terms, and a criminal history dating back to 1981. *Id.* Petitioner was also on parole at the time he committed this offense, having been released from Solano State Prison five days earlier on July 20, 1998.

Two months before his parole, San Quentin prison officials prescribed anti-psychotic drugs to petitioner. Pet. at 9. Upon being transferred from San Quentin to Solano prison, forty-five days prior to his release, petitioner was taken off the medications. *Id.* Petitioner has had a long history of mental health treatment while in prison, including the prescription of psychotropic drugs, dating back to the late 1980s. Pet.'s Evidentiary Hearing Ex. 4 (Kuper's Decl.) at 4. At one time, petitioner was a boxer, and sustained several blows to the head. *Id.* In 1982, petitioner was involved in a car accident, during which he likely suffered a concussion. *Id.*

Petitioner pleaded not guilty to the robbery charge on August 21, 1998. On October 20, 1998, petitioner changed his plea to nolo contendere. Petitioner changed his plea after he and his attorney, Katherine Jacomb, discussed his trial defense options. Pet.'s Evid. Hearing Ex. 10 (Letter from Jacomb to Louis Hiken) at 1. Ms. Jacomb testified at the evidentiary hearing that she proposed a plea of nolo contendere, with the hope that petitioner would be put in a residential drug treatment program, "as, really, the only viable alternative to a sentence of 35 to life." Reporter's Transcript of the evidentiary hearing ("RT") at 15. Ms. Jacomb agreed that petitioner's "interest in the [rehabilitation] program appear[ed], at least initially, to have been quite low." *Id.* Ms. Jacomb advised petitioner, however, that "he really had no other choice," *id.*, and consequently they agreed that petitioner should change his plea to nolo contendere and undergo evaluation for his amenability to long-term drug treatment, Pet.'s Evid. Hearing Ex. 10 at 1.

At the same time, petitioner and Ms. Jacomb also discussed the possibility of a plea of not guilty by reason of insanity. *Id.* at 2. Ms. Jacomb informed petitioner that any insanity claim would likely fail due to testimony of the victim and a pursuing police officer that petitioner's actions were purposeful. Resp.'s Ex. 5 (Jacomb Decl. at 2). According to Ms. Jacomb, both she and petitioner agreed that an insanity plea would not serve petitioner's stated goal of admission to a rehabilitation facility. *Id.* at 1.

Ms. Jacomb stated in her declaration that petitioner expressed understanding that he must plead "open," or nolo contendere, in order to obtain any sentencing leeway under the three strikes law.

2

According to Ms. Jacomb, petitioner appeared to understand the complex legal issues surrounding his case and possible sentencing. *Id.* Ms. Jacomb informed petitioner of the possibility that the court could choose not to exercise its sentencing discretion in petitioner's favor. CT at 31-33. Ms. Jacomb hoped that the court would impose a 19 year suspended sentence with probation, strike petitioner's previous strikes and place petitioner in a residential drug program. CT at 34-35.

During the plea colloquy on October 20, 1998, petitioner responded affirmatively to the court's questions regarding his understanding of the nature of the charges, the array of his available defenses, possible sentencing, and his constitutional rights (i.e. to remain silent, to trial by jury). Resp.'s Ex. 3 (Reporter's Transcript, October 20, 1998) at 3-6.

The sentencing hearing was scheduled for March 3, 1999. CT at 53. Prior to the sentencing hearing, Jeffrey S. Kline, Ph.D., evaluated petitioner for approximately ten hours, spanning the days of February 15 through February 18, 1999, and February 22, 1999. Pet.'s Evid. Hearing Ex. 5 (Kline Evaluation) at 1. In his report, Dr. Kline noted that Ms. Jacomb specifically "requested [the] evaluation as a potential component of a request to the Judge to exercise discretion to disregard one or both prior strikes so that the defendant could be eligible for probation and mandated rehabilitation." *Id.* at 2. Dr. Kline testified at the evidentiary hearing that he did not assess petitioner's competency to enter a plea, nor did he assess petitioner's state of mind at the time of the offense. RT at 131-32. Dr. Kline assessed petitioner without reference to any prior mental health or medical records, and during Dr. Kline's evaluation, petitioner explicitly denied any prior mental health history or treatment. Pet.'s Evid. Hearing Ex. 5 (Kline Eval.) at 3-4.

After conducting a battery of psychological tests, Dr. Kline concluded that petitioner displayed some indication of dementia due to multiple etiologies (blows to head from boxing, possible concussion from car accident, and long-term substance abuse), that he was likely mildly retarded, and that his auditory, verbal and visual cognitive abilities were in the severely impaired range compared to other men in his age group. *Id.* at 9. Dr. Kline noted that, although still quite low, petitioner's verbal reasoning was strong relative to his other cognitive abilities. *Id.* Dr. Kline also concluded that petitioner displayed no signs of psychotic thought process or delusions. *Id.*

During the evaluation by Dr. Kline, petitioner expressed realistic ideas regarding what recovery

would involve if placed in a rehabilitation program. *Id.* at 10.  Dr. Kline did not believe, however, that petitioner was amenable to treatment in a program that was not sensitive to his "neurocognitive deficits and emotional dysregulation." *Id.*  Although Dr. Kline believed that the prescription of psychotropic medication could facilitate petitioner's participation in such programs, he noted that most facilities discourage the use of antianxiety medications due to their addictive quality. *Id.*

In the final section of his report, Dr. Kline made various diagnoses.  As "Axis I" diagnoses, meaning "major mental disorder[s] that are typically manifest by . . . behaviors and symptoms," RT at 143, Dr. Kline listed "Alcohol and Cocaine Dependence," "Dementia Due to Multiple Etiologies," "Generalized Anxiety Disorder," "and "Parent-Child Relational Problem." Kline Eval. at 11.  Dr. Kline also concluded in his report that petitioner's "personality is organized at a borderline level of organization . . . ." *Id.* at 10.  This level of organization, according to the report, "suggests significant problems in self-regulation of emotions and conduct, [and] transient impairments in his reality testing . . . ." *Id.*  According to Dr. Kline's testimony, "transient impairments in reality testing" is "like psychotic thinking.  For example, a paranoid idea or a paranoid delusion . . . ." RT at 146.

Ms. Jacomb stated that she did not make any further inquiries into petitioner's mental health upon receiving Dr. Kline's report. *See* RT at 83.  She asserted that this decision was based on both her own evaluation of her client's mental state and her fear that further interviews with Dr. Kline would uncover additional damaging evidence. *See id.* at 82-83.  Ms. Jacomb did not present Dr. Kline's evaluation to the court prior to sentencing, because she felt that it would not help petitioner in his stated goal of receiving probation and being placed in a rehabilitation facility.  Pet.'s Evid. Hearing Ex. 10 (Letter from Jacomb to Louis Hiken, July 9, 1999) at 1.

At a sentencing hearing on March 3, 1999, petitioner was sentenced to a prison term of thirty-five years to life.  CT at 70-72.  At the hearing, petitioner continued to express his desire for the court to place him in a long-term drug rehabilitation program, such as Delancy Street, and recounted for the court information conveyed to petitioner by a counselor for Delancy.  Resp.'s Ex. 3 (Reporter's Transcript, March 3, 1999 at 1-2).

After the sentencing, petitioner concurrently filed an appeal and a petition for writ of habeas corpus with the California Court of Appeal.  Resp.'s Ex. 4.  Petitioner argued that he was insane at the

4

time of the offense, that he was incompetent to enter the no contest plea, and that his sentence was cruel and unusual. *Id.* In light of this appeal, petitioner's court appointed appellate attorney, Louis Hiken, arranged for Dr. Terry Kupers to evaluate petitioner's mental state at the time of the crime and his competency at the time of his plea.

To that end, Dr. Kupers reviewed a number of documents, including seventy-five pages of medical records regarding mental health treatment petitioner received from the California Department of Corrections. Pet.'s Evid. Hearing Ex. 4 (Kuper's Declaration at 2). Dr. Kupers also conducted an approximately two hour interview of petitioner at San Quentin Prison on August 17, 1999, some ten months after petitioner entered his plea. *Id.* Dr. Kupers determined that petitioner suffered from a severe psychiatric disorder at the time he committed the crime, combined with longstanding dementia, alcohol intoxication, fatigue and possible drug use at the time of the crime. *Id.* at 10-11.

Dr. Kupers further concluded that petitioner was not competent at the time he entered his plea or at the time of sentencing, and did not possess the ability to participate in his own defense *Id.* at 11. Dr. Kupers supported his conclusions in part on the fact that petitioner had been deprived of previously prescribed psychotropic drugs forty-five days prior to his release from Solano Prison, and committed the crime five days subsequent to that release. *Id.* at 12. Furthermore, almost immediately upon incarceration for the crime for which the current sentence was imposed, the CDC diagnosed petitioner as having Substance Induced Psychosis and prescribed a powerful antipsychotic drug, Olanzapine. *Id.* at 12.

Dr. Kupers repeated these opinions at the evidentiary hearing, testifying that at the time of trial, petitioner "was not able to understand the proceedings"; that he suffered from "a serious mental disorder," "both dementia and functional psychosis"; and that "he was actually experiencing a psychotic episode while the proceedings were going on; and, therefore, was not able to act in a rational manner." RT at 208.

The California Court of Appeal denied both the appeal and the habeas petition; as to the appeal, it found petitioner's arguments to be based upon declarations and medical records outside the appellate record, which the court could not consider. *See* Resp.'s Ex. 4. Petitioner subsequently filed a petition for writ of habeas corpus with the California Supreme Court. Resp.'s Ex. 5. That petition was denied

in a one-sentence order. Resp.'s Ex. 6.

On June 11, 2001, petitioner filed a petition for writ of habeas corpus in this Court. On remand, the Court now reconsiders petitioner's habeas petition in light of the evidence adduced during the recent evidentiary hearing.

## LEGAL STANDARDS

### A. District Court Review Under 28 U.S.C. § 2254

District court review of petitions for writ of habeas corpus is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 121 S. Ct. 1910, 1920 (2001).

### B. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *See id.*[3]

First, the defendant must show that counsel's performance was deficient. This requires showing

---

[3] The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).

6

1 that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the
2 Sixth Amendment. *See id.* at 687.[4] The defendant must show that counsel's representation fell below
3 an objective standard of reasonableness. *See id.* at 688. The relevant inquiry is not what defense counsel
4 could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt*
5 *v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be
6 highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the
7 wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*,
8 261 F.3d 832, 838 (9th Cir. 2001) (finding no deficient performance by counsel who did not retain a
9 ballistics expert on a menacing charge where the same expert had been used in the successful defense
10 of the same defendant on a felon-in-possession charge); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.
11 1994); *but cf. United States v. Palomba*, 31 F.3d 1456, 1466 (9th Cir. 1994) (presumption of sound trial
12 strategy not applicable where indicia of tactical reflection by counsel on issue absent from record). The
13 reasonableness of counsel's decisions may be assessed according to professional norms prevailing at
14 the time of trial. *Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002).

15 Second, the defendant must show that counsel's errors were so serious as to deprive the
16 defendant of a fair trial, a trial whose result is reliable. *See Strickland*, 466 U.S. at 688. The test for
17 prejudice is not outcome-determinative, i.e., defendant need not show that the deficient conduct more
18 likely than not altered the outcome of the case; however, a simple showing that the defense was
19 impaired is also not sufficient. *See id.* at 693. The defendant must show that there is a reasonable
20 probability that, but for counsel's unprofessional errors, the result of the proceeding would have been
21 different; a reasonable probability is a probability sufficient to undermine confidence in the outcome.
22 *See Strickland*, 466 U.S. at 694; *see, e.g., Jones v. Wood*, 207 F.3d 557, 562-63 (9th Cir. 2000) (failure
23 to investigate and present "other suspect" evidence); *Hart v. Gomez*, 174 F.3d 1067, 1073 (9th Cir.
24 1999) (failure to introduce evidence that corroborated testimony of a key defense witness whom the jury
25 might otherwise not believe necessarily undermined confidence in the outcome); *Brown v. Myers*, 137

---

[4] A habeas petitioner has the burden of showing through evidentiary proof that counsel's performance was deficient. *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir.), *cert. denied*, 498 U.S. 960 (1990).

7

F.3d 1154, 1157 (9th Cir. 1998) (failure to investigate and present alibi witnesses prejudicial where, without corroborating witnesses, defendant's bare testimony left him without a defense); *United States v. Span*, 75 F.3d 1383, 1390 (9th Cir. 1996) (failure to request jury instruction prejudicial where reasonable probability defendants would have been acquitted with instruction); *Palomba*, 31 F.3d at 1465-66 (error that may increase defendant's sentence prejudicial even if reversal would not shorten prospective jail time); *Sanders*, 21 F.3d at 1461 (counsel's failure to interview individual who had confessed to crime and whom three eyewitnesses had identified as culprit prejudicial); *Smith v.Ylst*, 826 F.2d 872, 875 (9th Cir. 1987), *cert. denied*, 488 U.S. 829 (1988) (mental incapacity of counsel does not require per se reversal of conviction; defendant has burden to point to specific errors). In the context of a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland*, 466 U.S. at 691; *Turner*, 158 F.3d at 456. *Strickland* directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491).

A claim of negligence in conducting pretrial investigation can form the basis for a claim of ineffective assistance. *See United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983); *Hines v. Enomoto*, 658 F.2d 667, 676 (9th Cir. 1981). Counsel must, at a minimum, conduct a reasonable investigation enabling her to make informed decisions about how best to represent her client. *Sanders*, 21 F.3d at 1457. The duty of reasonable investigation extends to the issue of mental health. *See Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."); *Seidel v. Merkle*, 146 F.3d 750, 755-57 (9th Cir. 1998), *cert. denied*, 119 S. Ct. 850 (1999) (finding deficient performance by attorney who failed to investigate mental illness defense despite abundant signs of such illness, including medication of defendant by prison psychologist while awaiting trial, jail medical records and

bail hearing report indicating defendant had been treated at V.A. hospital for mental disorder, and defendant's statement to counsel about symptoms related to his mental condition); *Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992) (vacating judgment of district court where not possible to determine whether counsel's decision not to investigate was sufficiently informed or strategic); *United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (counsel's performance deficient where failure to investigate possibility of mental illness defense); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th Cir. 1989), *vacated on other grounds*, 506 U.S. 935 (1992) (no strategic decision where defense based on petitioner's psychiatric problems but counsel failed to even consider investigating evidence to bolster defense); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (failure to investigate possibility of mental impairment cannot be construed as trial tactic where relevant available documents not even reviewed by counsel).

Where the decision not to investigate further is taken because of reasonable tactical evaluations, the attorney's performance is not constitutionally deficient. *See Siripongs v.Calderon*, 133 F.3d 732, 734 (9th Cir. 1998). If counsel reviews the preliminary facts of the case and reasonably decides to pursue only one of two conflicting defense theories, for example, she need not investigate the abandoned defense theory further. *See, e.g., Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998) (attorney's duty to further investigate diminished capacity defense ended when he chose to present an alibi theory rather than a diminished capacity defense based largely on defendant's representations that he was not present during the crime, defendant's refusal to blame his alleged co-burglar, and defendant's refusal to adopt the diminished capacity defense). Similarly, the failure to investigate a defense may not be ineffective assistance where it was due to the defendant's failure to inform the attorney of relevant facts and insistence on a particular course of action. *See Langford v. Day*, 110 F.3d 1380, 1386-88 (9th Cir. 1997) (attorney's failure to investigate a *Miranda* defense was not below the range of competence required where defendant failed to tell attorney about facts suggesting a *Miranda* violation and insisted on pleading guilty and seeking death penalty unless attorney could guarantee a short prison sentence); *see also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (attorney's failure to uncover family history of mental illness not unreasonable where investigation revealed no indication of such a history). But counsel is not free to accept unconvincing denials from a defendant without some minimal

9

investigation of the facts. *See Johnson v. Baldwin*, 114 F.3d 835, 835-40 (9th Cir. 1997) (counsel's failure to investigate and discredit defendant's unconvincing denial that he was present at scene of alleged crime fell outside range of competent assistance because it deprived defendant of other defenses); *cf. Phillips v. Woodford*, 267 F.3d 966, 978-80 (9th Cir. 2001) (no deference to counsel's decision not to investigate any defense other than the implausible alibi story offered by defendant which even counsel did not believe). Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994), *cert. denied*, 514 U.S. 1026 (1995) (decision whether to introduce medical evidence largely question of professional judgment).

### C.     Competency to Enter a Plea

The standard for competency to plead guilty is identical to the standard for competency to stand trial. *See Godinez v. Moran*, 509 U.S. 389, 396-99 (1993). The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- whether he has a rational as well as factual understanding of the proceedings against him." *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985), *cert. denied*, 474 U.S. 1085 (1986) (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960), and *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981)).

## DISCUSSION

### A.     Ineffective Assistance of Counsel

To prevail on his claim for ineffective assistance of counsel, petitioner must show that his attorney's performance was deficient and that the deficient performance prejudiced petitioner. *See Strickland*, 466 U.S. 668, 687-88.[5] Judicial scrutiny of attorney conduct is highly deferential, and absent strong evidence to the contrary, there is a presumption that the counsel's conduct falls within the wide

---

[5] The *Strickland* framework for evaluating claims of ineffective assistance of counsel at trial also applies to claims of ineffective assistance during the plea process. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

range of reasonable professional assistance. *Id.* at 689.  Based on the facts in the present case, this Court finds that petitioner was denied his Sixth Amendment right to effective assistance of counsel.

### 1. Deficient assistance

First, petitioner must demonstrate that Ms. Jacomb's performance fell below an objective standard of reasonableness based on prevailing professional norms. *See Strickland* at 688; *Silva v. Woodford*, 279 F.3d 825, 46 (9th Cir. 2002).  Reasonableness is assessed, not based on what defense counsel could have done, but rather on whether the choices that defense counsel made were reasonable in light of all attendant circumstances. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

In the Court's prior order denying habeas relief, the Court found that "Ms. Jacomb did not know petitioner's mental health history, due both to his failure to inform her and to his lack of outward and obvious manifestations of the possible presence of such history." October 21, 2003 Order at 13:23-25. Because of this, "and because petitioner continued to assert that his goal was treatment, Ms. Jacomb did not pursue an evaluation of petitioner with an insanity defense in mind." *Id.* at 13:25-26. Accordingly, "it does not appear that Ms. Jacomb's reasoning in deciding how best to serve her client was insufficient or below professionally acceptable norms." *Id.* at 14:9-10.  Facts adduced at the evidentiary hearing now cast substantial doubt on the Court's findings.

First, the evidentiary hearing highlighted previously unconsidered communications from petitioner to Ms. Jacomb regarding his mental health problems.  For example, according to Ms. Jacomb's contemporaneous notes, petitioner informed her on August 19, 1988 that he had "been in serious depression since 1994," RT at 20; that he "saw [a] psychiatrist a couple of time in the California Department of Corrections," RT at 22; that his "mother told him something in 1994 that threw him," RT at 22; and that ever since the incident in 1994, he could not "think straight," *id.* Ms. Jacomb testified during the evidentiary hearing that the declaration she submitted in connection with the prior habeas proceedings in this Court did not reflect this conversation. RT at 21.

On October 14, 1998, six days before petitioner's change of plea, he told Ms. Jacomb, "I told you what was happening with me. I was on drugs and all that." RT and 35.  He continued, that he "was in two wrong states of mind," one stemming from his use of drugs and alcohol, the other being the "problem with [his] mind . . . because of what happened to [him] in '94." RT at 35-36.  At the

11

evidentiary hearing, Ms. Jacomb testified that, at the time of this conversation, she understood petitioner to be referring to a previous occasion on which he told her that "something in 1994 was so upsetting to him that his mind hadn't been right since then." RT at 37.

On December 22, 1998, after petitioner entered his plea but before sentencing, petitioner again told Ms. Jacomb that "he was not in his right mind" at the time he committed the offense. RT at 54. He made clear that he was not referring solely to being under the influence of drugs and alcohol, again referring to the "problem in 1994 that made him fall apart mentally and emotionally." *Id.*

On February 5, 1999, approximately one month before sentencing, petitioner repeated to Ms. Jacomb that he "had something happen to me in '94, and that's still affecting me." RT at 63. Ms. Jacomb testified that she understood petitioner to be referring to the same 1994 incident with his mother about which he had previously informed her. *Id.*

In addition to highlighting statements in which petitioner suggested his past psychiatric problems, the evidentiary hearing also brought forth evidence that through his behavior, petitioner showed Ms. Jacomb signs of mental health problems. This evidence contrasts the Court's prior finding that petitioner never showed any "outward and obvious manifestations of the possible presence of" a mental health history. Ms. Jacomb's contemporaneous notes, for example, refer on multiple occasions to petitioner "babbling," RT at 24, 30, 35, 41, 51, 63, "stammering," RT at 30, 53, and "circumlocuting," RT at 17. The notes also refer to petitioner being "confused," RT at 51, 53, and Ms. Jacomb testified at the evidentiary hearing that though "[t]here were times when he was not confused," he "was often confused," RT at 54.

Ms. Jacomb's notes and testimony also show that in his conversations with her, petitioner returned to the same topics of discussion, over and over, both within one conversation, and from one to the next. For example, the notes from an October 14, 1998 phone call from petitioner state that "[over] the course of ~ 50 min[utes], I constantly had to repeat to Cobbs that the judge has limited options . . . ." Pet.'s Evid. Hearing Ex. 1 (Jacomb Notes) at 21. Petitioner also called several times in the same day, "wanting to revisit the things we had already discussed." *Id.* at 29; *id.* at 16 ("We went over and around the same old stuff <u>again</u>") (emphasis in original); *id.* at 22 ("Cobbs nervous, jumpy, babbling same things over and over, after covering same issues repeatedly") *see also, e.g.*, RT at 32 (Ms.

Jacomb explaining that she underlined the word "again" in her notes to indicate that she had already told petitioner something more that once).

Ms. Jacomb's notes from a meeting with petitioner on October 26, 1998, also reflect suspicious behavior by petitioner. Jacomb Notes at 27. At the end of the notes, Ms. Jacomb wrote: "Whines some more, then asks me if I'm laughing (I was making <u>no</u> noise, not even breathing hard.)." *Id.* (emphasis in original). Ms. Jacomb testified that she found this behavior "odd," and that "[i]t was a paranoid thing to say . . . ." RT at 51. Ms. Jacomb also made a notation during a phone call on February 23, 1999, that she "could not understand words or concepts" that petitioner was attempting to communicate. RT at 63-64.

In its prior order, this Court also found that Ms. Jacomb's failure to investigate petitioner's mental health was not unreasonable because "he was insistent in his desire to receive probation and rehabilitation," and not pursue an insanity defense. Order at 14:7-8. Evidence arising at the recent hearing also casts doubt on this finding. Ms. Jacomb testified she presented residential drug treatment to petitioner "as, really, the only viable alternative to a sentence of 35 to life," and that petitioner's "interest in the [rehabilitation] program appear[ed], at least initially, to have been quite low." RT at 15. Ms. Jacomb's failure to investigate his mental health cannot therefore be explained away by a single-minded insistence on the part of petitioner to pursue residential drug treatment instead of an insanity defense.

Petitioner's noted behavior – babbling, returning to the same topics over and over, asking a silent Ms. Jacomb if she was laughing – combined with his repeated communications to her regarding the "problem in 1994 that made him fall apart mentally and emotionally," and his references to serious depression and visiting with psychiatrists, would have led a reasonable counsel to conduct further investigation into petitioner's mental health. Thus, "counsel's failure to conduct any investigation into Cobbs's mental health history was objectively unreasonable in light of prevailing professional norms." *Cobbs v. McGraff*, 123 Fed. Appx. 794, 797 (9th Cir. 2005), slip op. at 6; *see also Douglas*, 316 F.3d at 1085; *Seidel*, 146 F.3d at 755-57.

**2.     Prejudice**

13

Respondents argue that even if Ms. Jacomb's conduct in failing to investigate petitioner's mental status was unreasonable, her failure to investigate did not prejudice the defense. In order to show prejudice and satisfy the second part of the *Strickland* test for evaluating ineffective assistance of counsel, petitioner must demonstrate that counsel's constitutionally ineffective performance affected the outcome of the plea process. *See Hill v. Lockhart*, 474 U.S. at 59. In other words, petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* "[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Id.* Here, much of respondent's argument regarding prejudice revolves around the issue of whether an insanity defense would ultimately have succeeded at trial. As discussed, however, petitioner need not establish as much. Petitioner need only establish that a reasonable investigation into his mental health would have led Ms. Jacomb "to change [her] recommendation as to the plea." *Hill*, 474 U.S. at 59. As the Ninth Circuit stated in this case, petitioner need only show that had she conducted a reasonable investigation, "[c]ounsel would not have advised Cobbs to plead nolo contendere in the hope that he could receive drug rehabilitation . . . ." *Cobbs*, slip op. at 7.

Ms. Jacomb's testimony leaves little doubt that petitioner has met this standard for prejudice. During her testimony, she agreed that her "advice would, in fact, have been different had [she] understood Mr. Cobbs' prior mental health history." RT at 89. This Court reached the same conclusion in the original order denying habeas relief. *See* Order at 14:11-13 ("Ms. Jacomb now asserts that had she been aware of petitioner's previous mental health history and treatment, she would have more strongly discouraged petitioner's treatment goal in favor of a possible insanity plea."); 14:20-22 ("Ms. Jacomb herself admits that had she possessed the information regarding her client's mental health history, she would have made different strategic defense choices.").

Even if Ms. Jacomb's had advised petitioner differently, if petitioner had nonetheless insisted on pleading nolo contendere, then her failure to properly investigate and advise might be irrelevant and non-prejudicial. *See Langford*, 110 F.3d at 1386-88 (the failure to investigate a defense may not be

14

ineffective assistance where it was due to the defendant's failure to inform the attorney of relevant facts and insistence on a particular course of action). As discussed above, however, the evidence shows that petitioner pursued the treatment program option based largely on Ms. Jacomb's recommendation. There is no evidence to suggest that had Ms. Jacomb advised against pleading nolo contendere and instead suggested an insanity defense, petitioner would not have cooperated.

Had Ms. Jacomb conducted a minimal investigation into petitioner's mental health and history, it is undisputed that she would have uncovered ample evidence that he suffered from significant mental health problems. She admits that had she uncovered such evidence, she would have pursued a different defense strategy, and would not have counseled petitioner to plead nolo contendere. Thus, the Court is now convinced that but for Ms. Jacomb's failure to unearth petitioner's mental health history, it is reasonably probable that the result would have been different, or that petitioner would not have entered his plea of no contest and would have insisted instead on going to trial. *See Hill v. Lockhart*, 474 U.S. at 59. Petitioner was therefore deprived of his Sixth Amendment right to effective assistance of counsel.

**B.      Competency to Enter a Plea**

The Ninth Circuit directed this Court to conduct a "retrospective determination of Cobbs's competency during trial court proceedings." *Cobbs*, slip op. at 5. To demonstrate that he was incompetent to enter his plea of nolo contendere, petitioner must show that he lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or lacked "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396, 398 (1993) (quoting case).

Based on the testimony of Drs. Kupers and Kline at the evidentiary hearing, evidence of petitioner's mental health history, and his behavior and mental state as reflected in Ms. Jacomb's contemporaneous notes, the Court concludes that petitioner was not competent to enter a plea.

As discussed, Dr. Kupers opined at the evidentiary hearing that at the time of trial, petitioner "was not able to understand the proceedings"; that he suffered from "a serious mental disorder," "both dementia and functional psychosis"; and that "he was actually experiencing a psychotic episode while the proceedings were going on; and, therefore, was not able to act in a rational manner." RT at 208; *see*

15

*generally* Pet.'s Evid. Hearing Ex. 4 (Kupers Decl.). Dr. Kline opined that Dr. Kupers' "diagnosis of some type of primary psychotic disorder is sensible," and that "[c]learly, Dr. Kupers and I agree that Mr. Cobbs suffers from severe mental disorders that require specialized psychiatric treatment." Pet.'s Evid. Hearing Ex. 11 (Letter from Dr. Kline to Louis Hiken) at 2; *see also* RT at 156-57. The Court has no reason to doubt the credibility or qualifications of either Doctor.

The fact that petitioner was incompetent during the time leading up to his sentencing is further supported by his California Department of Corrections ("CDC") records. According to Dr. Kupers' synopsis of the CDC records, petitioner was prescribed various medications, including anti-psychotics, soon after his arrival at San Quentin after sentencing in this case. *See* Pet.'s Evid. Hearing Ex. 4 at 5. Furthermore, a CDC psychiatrist, Dr. Deigman, diagnosed petitioner as having "Substance-Induced Psychosis" with symptoms including "hallucinated voices and delusions," soon after he was sentenced. *See id.*

Furthermore, the Court finds that petitioner's behavior leading up to his plea and sentencing buttresses Dr. Kupers' opinion regarding his competency. As discussed at length above, in his interactions with Ms. Jacomb, petitioner exhibited significant mental health problems.

In response to Dr. Kupers' opinion, respondent points to numerous instances where petitioner appeared to Ms. Jacomb to understand the nature of the proceedings, and appeared to be participating rationally in his defense. For example, Ms. Jacomb's notes reflect that petitioner knew he was on trial for "popp[ing] the chain off somebody's neck," Jacomb Notes at 11, and that he participated in his defense strategy by expressing a preference for a particular judge to conduct the sentencing, *see id.* at 34. These moments of apparent understanding, however, do not counter the overwhelming evidence that petitioner was often confused, that he required – to an exceptional degree – repeated explanations of his legal situation, that he rambled and babbled, and that he generally had extremely limited cognitive ability (mildly retarded, according to Dr. Kline; *see* RT at 134). Even if petitioner truly understood the nature of the proceedings at a given moment, Dr. Kupers convincingly testified that it is extremely common for a psychotic individual such as petitioner to "fade[] in and out of coherence, basically in and out of confusion." RT at 209. Because of this, the fact that petitioner may have "understood what was going on at one moment doesn't undo all the other entries in the record about his babbling about his

amnesia and about his confusion." RT at 210.

For these reasons, the Court finds that petitioner lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and lacked "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396, 398 (1993) (quoting case). Petitioner was therefore not competent to enter a plea, and his conviction violated due process. *See Drope v. Missouri*, 420 U.S. 162, 171-73 (1975).

## CONCLUSION

For the foregoing reasons, the Court now orders:

1. The petition for writ of habeas corpus is GRANTED. [Docket # 1]

2. Cobbs' conviction in San Mateo Superior Court is VACATED and respondent must release Cobbs from custody within sixty days of the date this order is filed unless the State of California re-institutes criminal proceedings against him.

3. The clerk shall send a copy of this order to the San Mateo County Public Defender's Office. The Court requests that the San Mateo County Public Defender obtain representation for Cobbs in connection with his return to state court if he meets the eligibility requirements.

**IT IS SO ORDERED**.

DATED: March 14, 2007

SUSAN ILLSTON
United States District Judge